**UNITED STATES, Appellee,**

v.

**Calvin L. ALLEN, Seaman Apprentice, U.S. Navy, Appellant.**

**No. 67,142.**

**NMCM 89 4043.**

U.S. Court of Military Appeals.

Argued March 5, 1992.

Decided May 15, 1992.

For Appellant: *Major Richard T. McNeil, USMC* (argued); *Lieutenant David P. Sheldon, JAGC, USNR* (on brief).

For Appellee: *Lieutenant Commander J. Richard Chema, JAGC, USN* (argued); *Colonel T.G. Hess, USMC* (on brief); *Lieutenant Ralph G. Stiehm, JAGC, USNR.*

*Opinion of the Court*

WISS, Judge:

Although appellant pleaded not guilty, a general court-martial composed of a military judge alone convicted him of aggravated assault (tried as attempted murder), attempted rape, larceny, forcible sodomy, and indecent assault, in violation of Articles 128, 80, 121, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 928, 880, 921, 925, and 934, respectively. Thereafter, the military judge sentenced appellant to a dishonorable discharge, confinement for 45 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence.

In an unpublished opinion, the Court of Military Review reversed appellant's conviction of attempted rape but otherwise affirmed the findings below. On reassessment of the sentence, the court reduced the adjudged confinement to 30 years and affirmed the remaining elements of the sentence.

On appellant's petition to this Court, *see* Art. 67(a)(3), UCMJ, 10 USC § 867(a)(3) (1989), we granted review of the following two issues of law:

## I

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED WHEN IT APPLIED THE INEVITABLE DISCOVERY DOCTRINE TO EVIDENCE WHICH THE GOVERNMENT HAD NEVER INTRODUCED INTO EVIDENCE.

## II

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED WHEN IT FOUND A PREVIOUS ILLEGAL SEARCH AND SEIZURE OF APPELLANT HAD NOT TAINTED EVIDENCE SUBSEQUENTLY OBTAINED.

After a full consideration of the briefs and oral argument[1] of the parties on these issues, we affirm the decision below.

## I

The following recitation of facts appears in the opinion of the Court of Military Review:

As the victim was working alone in her office after hours, someone attacked her from behind. The assailant struck the victim numerous times on the head with an adding machine and then repeatedly slammed her head into the floor and a desk. Once the victim was unable to resist, the assailant then removed her hosiery and underwear, inserted his hand into her vagina several times and then performed cunnilingus on her. The assailant then appeared startled and got up and briefly left the room. When he returned, the victim heard "metal clanging" that she speculated was the sound of a belt buckle. She did not see her assailant's belt and had not heard this noise at any time before the assailant returned to the room. Her assailant then struck her head against the desk several more times and fled.

\* \* \* \* \* \*

The assaults in question occurred on 27 December 1988. The victim's initial description of her attacker was a black man, 5'11", 200 pounds with a slightly protruding stomach, short hair, and no glasses or facial hair. The day after her attack, the victim reviewed her initial statement given to NIS [Naval Investigative Service] and made several corrections but did not change the description. Based on her initial description, NIS decided to identify, interview, fingerprint and photograph all men fitting the description.

[At the crime scene, investigators had found bloody latent finger and palm prints on a desk-top calculator and a roll of calculator paper that they reasoned were prints of the attacker.]

On 30 December, the victim told Special Agent Moran she had heard a sailor called "Weird Al" on the USS FULTON fit the general description and had also been involved in a similar assault in New London, Connecticut. NIS contacted the USS FULTON on 30 December and

---

1. We heard oral argument in this case at the United States Naval Academy, Annapolis, Maryland, on Thursday, March 5, 1992, without objection from the parties involved. *See* Foundation of the Federal Bar Association, *Equal Justice Under Law: The Supreme Court in American Life* 15–18 (1965); *see also* D. O'Brien, *Storm Center: The Supreme Court in American Politics* 78, 135–40 (2d ed. 1990). This procedure is similar to the well-established practice of the United States Court of Appeals for the Eighth Circuit which holds hearings at various law schools within its circuit. The United States Court of Military Appeals conducts a hearing such as this outside its permanent courthouse in Washington, D.C., as part of its "Project Outreach," a public awareness project which demonstrates not only the operation of a Federal appellate court but also the quality and effectiveness of the criminal justice system of our Armed Services and the Uniform Code of Military Justice (Arts. 1–146, 10 USC §§ 801–946, respectively). It is hoped that the thousands of students, service persons, military and civilian attorneys, and members of the American public who witness these hearings will realize that America is a democracy that can maintain an Armed Force instilled with the appropriate discipline to make it a world power and yet afford the members of that Armed Force a fair and impartial justice system which does provide the full protection of the Constitution of the United States and Federal law to its members.

asked to be informed when appellant returned to the ship. Master Chief Master-at-Arms Russack instructed another sailor in his department to follow appellant around the ship, look for markings on his body, prevent appellant from destroying any clothing, and prevent appellant from leaving the ship. The assistant master-at-arms, Petty Officer DeGroat, followed appellant around the ship and noted some marks on appellant's body while watching appellant in the shower. When appellant attempted to leave the ship that Friday evening, Petty Officer DeGroat intercepted him and told appellant Master Chief Russack wanted to see him. Master Chief Russack told appellant some people wanted to talk to him. After waiting for some time, appellant said he wanted to leave and go to his civilian night job, but remained after the Master Chief said he would appreciate it if appellant would wait for the men coming to talk to him so they could get the matter cleared up. Special Agents Moran and Hajosy arrived and began asking appellant about his whereabouts the night in question. Appellant then signed a permissive search request. After the search, the agents obtained fingerprints and photographs of the appellant. The photograph showed appellant had a thick mustache. Agent Moran also noticed appellant had cuts on his elbow and finger.

Appellant remained with the Master-at-Arms and NIS agents from approximately 2130 to 2330 that evening. He never asked to leave while the NIS agents were with him. The agents did not advise appellant of his Article 31(b), UCMJ [10 USC § 831(b)], rights on 30 December because they did not specifically suspect him of committing an offense. At that time, NIS considered appellant as one of several individuals who fit the general description given by the victim. The agents said they would question and obtain fingerprints and photographs of anyone who fit the description. During the course of their investigation, NIS interviewed several hundred individuals matching the description and obtained fingerprints from a number of these individuals.

On 31 December, the morning after NIS agents contacted appellant, the victim made a change in her written statement of 28 December. Instead of describing her assailant as clean shaven, she now said she was only 50 percent sure whether or not her assailant had a mustache. NIS Agent Moran said he did not suggest anything about a mustache to the victim as she was reviewing her statement for a second time on 31 December.

On 10 January 1990 [should be 1989], Agent Moran asked appellant to come to the local hospital so NIS could check out new reports that appellant had fresh scratch wounds on his chest. Appellant cooperated and signed a consent form. After being examined at the hospital, appellant agreed to follow Agent Moran back to the NIS office where he consented to be fingerprinted and photographed again. The NIS agents wanted to get a better quality photograph and wanted fingerprints on a standard NIS card instead of the card used from the ship's fingerprint kit on 30 December. While appellant was still at the NIS offices on 10 January, the victim was in another area of the building and immediately picked appellant out of a photographic lineup created by NIS after receiving his photograph. He then became a suspect, received Article 31(b) warnings and agreed to make a statement.

On 11 January, Mr. Finkle [a fingerprint-identification expert with the Connecticut State Police Forensic Laboratory] received the fingerprint cards from NIS and concluded that appellant's fingerprints matched the prints found on the bloody items from the crime scene. The card of fingerprints obtained on 30 December that was used at trial was just one of a set of cards Mr. Finkle received. Fingerprints taken on 10 January were attached to the palm print Mr. Finkle received. Mr. Finkle examined the fingerprint card from 30 December and con-

cluded those prints were made by the same person who left a bloody print on the calculator paper at the crime scene. He also said the palm print of the appellant obtained on 10 January matched the bloody print left on the calculator.

Unpub. op. at 2, 4–5.

## II

■ A number of legal issues are suggested by these facts. For instance, under all the circumstances, was appellant "seized" on December 30, within the meaning of the Fourth Amendment, when he was kept on board the USS FULTON for a period of two hours? *Compare Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), and *United States v. Fagan*, 28 MJ 64 (CMA), *cert. denied*, 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 48 (1989), *with Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), and *United States v. Scott*, 22 MJ 297 (CMA 1986), *cert. denied*, 480 U.S. 931, 107 S.Ct. 1567, 94 L.Ed.2d 759 (1987). If so, was the "seizure" nonetheless lawful? *See Florida v. Bostick, supra; United States v. Phillips*, 30 MJ 1 (CMA 1990). If appellant was "seized" on December 30 and if that "seizure" was not lawful, were appellant's fingerprints and palm print that were taken on January 10 tainted by that earlier illegality and, thus, also not admissible? *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This latter issue, of course, raises a host of subsidiary questions like consent and attenuation. *See Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

We conclude, however—as did the Court of Military Review—that we need not answer these questions because, in any event, evidence of appellant's fingerprints and palm print would have been inevitably discovered. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Kozak*, 12 MJ 389 (CMA 1982). *See also United States v. Jones*, 26 MJ 353, 359 n. 9 (CMA 1988); *United States v. Roa*, 24 MJ 297, 302–03 (CMA 1987) (Sullivan, J., concurring in the result).

As the Supreme Court held in *Nix v. Williams, supra* 467 U.S. at 444, 104 S.Ct. at 2509:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received.

(Footnote omitted.) The Court earlier in its opinion had explained:

> The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

*Id.* at 443 n. 4, 104 S.Ct. at 2509 n. 4.

Applying the principle and the rationale of the inevitable-discovery rule to the facts of this case, we agree with the following government reasoning:

> Regardless of the legality of the 30 December fingerprinting, there is no doubt that the Government could and would have obtained another set of prints legally from appellant. Appellant fit the general description of the assailant. After the victim decided that she was uncertain whether appellant had a mustache or not, there was an even greater resemblance to the description. Even if somehow the NIS had not independently identified appellant as an individual to fingerprint, the most salient fact establishing both the inevitability and independence of the legal seizure of appellant's prints (and photograph for the victim identification), is that the victim herself provided the tip to NIS. Once it was known that an individual having the nickname "Weird Al" fit the general description of the assailant, had base access, was previously involved in some type of similar incident ..., and was someone the victim herself felt needed to be investigated, it was a foregone conclusion that during this high profile investigation prints would be obtained.

Answer to Final Brief at 23–24 (footnotes omitted). In addition, we observe that the NIS investigation included fingerprinting

of virtually all personnel who fit the victim's description of her assailant and who had base access on the night of the incident;[2] that appellant had fully cooperated in all aspects of the investigation and undoubtedly would have continued to cooperate in any additional requests for fingerprints; and that, under easily complied-with procedures, the NIS could have compelled appellant to produce his fingerprints, *see United States v. Fagan, supra*—if, indeed, appellant's fingerprints already were not part of his military file.

 Under all these circumstances, we hold that the Court of Military Review cor-

rectly concluded that the Government has shown by a preponderance of the evidence that the challenged evidence would have been inevitably discovered. *See also Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).[3]

### III

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.

---

**2.** As noted earlier, the victim's description of her assailant included the fact that the perpetrator was black and was a male. Logically, the NIS investigation focused on black men—black men who also fit the other aspects of the description. Appellant's assertion that the NIS investigation amounted to a "racially-based" dragnet is as baseless as to say that it was impermissibly *gender*-based. Indeed, if law enforcement investigators did *not* limit efforts like what occurred here to potential suspects who *met* the description, appellant and others similarly situated logically could be expected to complain about *that*. It is the very purpose of

investigations to *limit* the universe of potential suspects.

**3.** It is appellant's *fingerprints* which are the relevant evidence in this trial, not the *vehicle* for those fingerprints. Thus, assuming any illegality in obtaining the December 30 set of prints, the fact that that card was the *vehicle* that was admitted at trial does not legally or logically vitiate the sound application of the inevitable-discovery principle as to appellant's *fingerprints*. *Compare United States v. Cherry*, 759 F.2d 1196 (5th Cir.1985), *with Bynum v. United States*, 262 F.2d 465 (D.C.Cir.1958).