**UNITED STATES, Appellee,**

v.

**Edward L. JENKINS, Sergeant, U.S. Marine Corps, Appellant.**

No. 99–0631.
Crim.App. No. 97 1567.

U.S. Court of Appeals for the Armed Forces.

Argued March 22, 2000.

Decided Aug. 31, 2000.

Crawford, Chief Judge, concurred in result and filed opinion.

GIERKE, J., delivered the opinion of the Court, in which EFFRON, J., and TURRENTINE[1], and FITZGERALD[2], S.JJ., joined. CRAWFORD, C.J., filed an opinion concurring in the result.

For Appellant: *Lieutenant John D. Holden,* JAGC, USNR (argued); *Lieutenant M. Eric Eversole,* JAGC, USNR.

For Appellee: *Lieutenant Danette L. Walker,* JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler,* USMC, and *Commander Eugene E. Irvin,* JAGC, USN (on brief); *Lieutenant Commander JoAnn W. Melesky,* JAGC, USN.

1. Senior Judge Howard B. Turrentine of the United States District Court for the Southern District of California, sitting by designation pursuant to Article 142(f), UCMJ, 10 USC § 942(f).

2. Senior Judge James M. Fitzgerald of the United States District Court for the District of Alaska, sitting by designation pursuant to Article 142(f), UCMJ, 10 USC § 942(f).

Amici Curiae Urging Reversal: *Trevor Rush* (Law Student) (argued); *Lieutenant David Volkin,* JAGC, USN (Amicus Curiae Supervising Attorney); *Michael Ramsey; Michael Fernandez, James Golladay,* and *Michael Yuan* (Law Students)—For University of San Diego School of Law.

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of 37 specifications of larceny, 25 specifications of forgery, and one specification each of wrongfully using and of making an Armed Forces Identification Card, in violation of Articles 121, 123, and 134, Uniform Code of Military Justice, 10 USC §§ 921, 923, and 934, respectively. The adjudged sentence provides for a dishonorable discharge, confinement for 15 years, total forfeitures, a fine of $15,000 (enforced by an additional 5 years of confinement if the fine is not paid), and reduction to the lowest enlisted grade. The convening authority approved the sentence with a slight modification of forfeitures. The Court of Criminal Appeals affirmed the findings and sentence. 50 MJ 577 (1999).

Our Court granted review of two issues:

I

WHETHER THE LOWER COURT ERRED IN FINDING NO PREJUDICE WHERE THE TRIAL COUNSEL COMMITTED PLAIN ERROR BY REPEATEDLY ASKING APPELLANT ON CROSS–EXAMINATION WHETHER NUMEROUS WITNESSES WHO HAD TESTIFIED INCONSISTENTLY WITH APPELLANT WERE LYING.

II

WHETHER TRIAL COUNSEL COMMITTED PLAIN ERROR BY ARGUING FOR INCREASED PUNISHMENT BECAUSE APPELLANT PURPORTEDLY TESTIFIED FALSELY.

For the reasons set out below, we affirm.[3]

## ISSUE I: TRIAL COUNSEL'S CROSS–EXAMINATION

### Facts

Appellant was the supply sergeant at Separations Company, Camp Pendleton, California. Marines who were being discharged were out-processed by Separations Company. They would receive a final accounting of pay, after which Separations Company personnel would mail a final pay check to the discharged Marine. The theory of the prosecution was that appellant stole those final pay checks before they were mailed, then either cashed them or procured others to cash them, using fraudulent Armed Forces Identification Cards.

Chief Warrant Officer (CWO) Gorman, executive officer of Separations Company, testified that one of appellant's duties was to compile the "shopping list" of supplies requested by members of the company. The prosecution presented documentary evidence showing that appellant ordered and received a package of 100 blank Armed Forces Identification Cards, but the identification cards were never received by Separations Company. The supply documents appear to bear the signatures of CWO Gorman, as the officer requesting the identification cards, and Staff Sergeant (SSgt) Garza, chief of administration, acknowledging receipt of the cards. Both CWO Gorman and SSgt Garza testified that they did not sign the documents.

Naval Criminal Investigative Service (NCIS) Special Agent (SA) McKenzie testified that appellant was questioned about the missing identification cards and consented to a search of his off-base residence. During the search, NCIS agents found a blank identification card inside a record album. Inside a large vase the agents found a manila envelope containing three partial identification cards bearing the names of three of the

---

3. We heard oral argument in this case at the University of San Diego Law School, San Diego, California, on March 22, 2000, as part of our "Project Outreach." *See United States v. Allen,* 34 MJ 228, 229 n. 1 (CMA 1992).

alleged victims and small pieces of other identifications cards. The envelope also contained a cut up identification-card photo of Sergeant (Sgt) Spencer, one of appellant's alleged co-actors, and a partial identification-card photo of appellant. The back of the envelope contained "practice signatures." The NCIS agents also found lamination material in a dining room closet and an identification-card-sized photograph of appellant in a wall unit in the living room.

The NCIS agents also searched appellant's personal vehicle. In a storage pouch at the rear of the driver's seat they found a copy of the document requesting issuance of the blank identification cards, purporting to bear CWO Gorman's and SSgt Garza's signatures.

Corporal (Cpl) Saenz–Ortega testified about the procedures used by Separations Company to issue and mail pay checks. He described one occasion when a check was discovered missing and was later recovered by appellant from a trash can in front of another building and turned in to CWO Gorman.

All three of appellant's co-actors testified against him pursuant to grants of immunity. Patricia Gibson, a civilian payroll technician, testified that she and appellant became friends and that the friendship evolved into an "intimate relationship." She testified that, at appellant's request, she endorsed the backs of a number of Treasury checks made out to various individuals and signed several identification cards.

Former-sergeant Jessie James Spencer testified that when discharged Marines started calling Separation Company about missing checks, he suspected that appellant was stealing them. His suspicions arose because appellant seemed to have a lot of money and because he observed what appeared to be a surreptitious conversation between appellant and Cpl Kevin Lynk. He told appellant that he "wanted in." Spencer described how he and appellant stole the checks from the outgoing mail, made phony identification cards reflecting the names of the payees on the stolen checks, and cashed the checks.

Former-corporal Kevin Lynk testified that he worked for appellant for a year. He testified that appellant asked him to cash a check that had been returned to the company. He agreed after appellant "persistently asked [him] for about two weeks." Appellant used the Polaroid camera from the company to take Lynk's photograph and then made him a phony identification card. Lynk used the phony identification card to cash the check and shared the proceeds with appellant. Lynk subsequently cashed two more checks for appellant and shared the proceeds with him.

There was no dispute that the checks had been stolen and forged. Nevertheless, the prosecution presented expert testimony and documentary evidence establishing that the named payees did not endorse the checks, and the defense so stipulated. In addition, the prosecution presented evidence that appellant's fingerprints were identified on a small piece of paper in the vase containing the pieces of identification cards and cut-up photographs, and on 12 of the forged checks. Spencer's fingerprints were identified on seven forged checks.

The defense theory, articulated in civilian defense counsel's opening statement, was that Spencer and Lynk were involved in a conspiracy to cash government checks, that they "became the object of suspicion," and that they decided to frame appellant to "get the heat or the trail off of them." With respect to Ms. Gibson, the defense theory was that she was "the spurned woman" who was jealous because appellant became involved with another woman.

Appellant testified in his own defense. He testified that the vase containing the evidence seized by the NCIS agents was in his office until April of 1996, when he moved it and a number of other personal items from his office to his residence. He testified that Ms. Gibson helped him by transporting the items, including the vase, in her car while he rode his motorcycle to his home.

He testified that he was in the bathroom when NCIS agents removed the brown envelope from the vase. He stated that he did not know how the envelope was placed in the

vase. He speculated that it must have happened at work.

Appellant explained his fingerprints on the forged checks by testifying that he handled checks by assisting Sgt Spencer sort the incoming mail. The checks were in "return to sender" mail, which appellant and Sgt Spender opened and sorted.

Appellant denied taking checks or mail from the outgoing mail box. He denied cashing any of the checks. He denied sharing in the proceeds of any of the checks. He denied having any "clandestine meetings" with Lynk.

Appellant admitted obtaining the blank identification cards. He testified that CWO Gorman told him to take the "shopping list" to supply and that the list was already prepared.

Regarding the missing-check incident described by Cpl Saenz–Ortega, appellant testified that all the Marines in the company were assembled because of the missing check. After they were released, appellant "took it upon [himself] to check the trash cans" around "an abandoned building." He testified that he saw the check in the trash can, brought the entire trash can back to the company, and watched while CWO Gorman, in the presence of the first sergeant and the Military Police, retrieved the check from the trash can.

Appellant testified that when he returned from supply with the blank identification cards, he gave them and the paperwork to Cpl Lynk and instructed him to take the identification cards to the administration area and to bring back the receipt. Cpl Saenz–Ortega placed the receipt in appellant's mail box in the administration section. Appellant denied signing SSgt Garza's name on the receipt for the blank identification cards.

The questions forming the basis of the first granted issue occurred during cross-examination of appellant. Trial counsel asked four times if CWO Gorman was lying when he said that it was appellant's job to type the "shopping list." Appellant responded that CWO Gorman did not know who typed the list. He testified that some of CWO Gor-

man's testimony was incorrect, because CWO Gorman changed the procedures. Trial counsel asked once if CWO Gorman was lying when he testified that picking up blank identification cards was one of appellant's "main duties." Appellant responded that CWO Gorman was not lying.

Trial counsel asked if Cpl Saenz–Ortega was lying when he testified that "there was no trash can involved" in the recovery of the missing check. Appellant responded without characterizing the truthfulness of Saenz–Ortega's testimony; he testified, "Ma'am, there was a trash can involved in the situation."

Trial counsel asked three times if government witnesses were lying when they testified that appellant was not authorized to touch the Treasury checks. Appellant responded that he did not know if they were lying because he did not know if he was authorized to handle the checks.

Trial counsel asked five times if Cpl Lynk was lying when he testified that appellant gave him checks and "hounded him" to cash them. Appellant responded that Lynk was lying. Trial counsel asked if Lynk was lying when he testified that he had never seen the record album where the blank identification card was found, and appellant again responded that Lynk was lying.

Trial counsel asked if Ms. Gibson "made those events up," meaning her involvement in the endorsement of checks and preparation of a phony identification card, and appellant responded, "Yes, ma'am." Trial counsel asked if Ms. Gibson was lying when she testified that appellant gave the "other woman" $5000 to purchase a car, and appellant responded, "Yes, ma'am."

Trial counsel asked five times if former-sergeant Spencer was lying. Appellant responded in the affirmative.

Finally, trial counsel asked six times if SA McKenzie was lying about finding the envelope in the vase in appellant's presence. Appellant responded in the affirmative.

Defense counsel did not object to any of the questions about lying, except on one oc-

casion when he objected on the ground that the question was "vague as to 'lying'" and the judge sustained the objection.

Closing arguments focused on credibility of the witnesses and appellant. Trial counsel's argument included the following:

Gentlemen, as the factfinders, it's going to be your duty to judge the credibility of the witnesses.

Consider what they said in the courtroom today and over the last three days. Consider the demeanor of all of those that you've seen in the courtroom. When you consider that, you consider who was the slickest witness you saw was [sic]. You consider who had the ready answer to every question.

\* \* \*

The evidence is before you. The evidence is black and white. If all these people came in here and lied, the thief's a liar too. There is only one conclusion, gentlemen. The thief and a liar is guilty of each and every one of those offenses before you on that charge sheet.

Defense counsel's closing argument included the following:

I think Patricia Gibson has some feelings for my client. And in these domestic type of situations, hell hath no fury like a woman—a spurned woman.

\* \* \*

My client's the only one who said, "I didn't do it. These guys did it, and they're framing me."

The Court of Criminal Appeals held that trial counsel's cross-examination constituted "clear and obvious error," but "these questions nonetheless **did not** materially prejudice the substantial rights of appellant." (Emphasis in original.) The court found the Government's evidence overwhelming and concluded that "the errors were harmless under the particular facts of this case." 50 MJ at 580.

Appellant now asserts that the court below erred by finding that the errors were harmless. He argues that his "entire defense rested upon his own credibility" and that trial counsel's improper cross-examination "struck at the very heart of this defense and undermined Appellant's entire case." Final Brief at 4.

The Government asserts that trial counsel's cross-examination was not error at all, much less plain error. Answer to Final Brief at 2.

*Amicus curiae* assert that trial counsel's questions were improper because they infringed on the court members' role in determining the credibility of witnesses, that the Government's case was not overwhelming, and "that the error materially prejudiced" appellant's "right to a fair trial." Amicus Brief at 1.

### Discussion

Mil.R.Evid. 608(a), Manual for Courts-Martial, United States (1995 ed.),[4] permits the credibility of a witness to be attacked or supported by evidence in the form of an opinion, but the evidence may refer only to the witness' character for truthfulness or untruthfulness. This Court has consistently held that a witness may not opine that another witness is lying or telling the truth. *See, e.g., United States v. Birdsall,* 47 MJ 404, 410 (1998); *United States v. Marrie,* 43 MJ 35, 41 (1995). The basis for this rule was set out in *United States v. Cameron,* 21 MJ 59, 63 (1985), where this Court reiterated:

The rule remains that, absent unusual circumstances, opinion testimony on whether or not to believe a particular witness' testimony simply is not deemed helpful to the factfinder, for the factfinders are perfectly capable of observing and assessing a witness' credibility.

■ This Court has not directly addressed the question whether it is improper for trial counsel to ask an accused to opine whether the government witnesses against him are lying. The Second Circuit addressed the

4. All Manual provisions are cited to the version applicable at trial. The 1998 version is un-

changed, unless otherwise indicated.

issue, however, in *United States v. Richter*, 826 F.2d 206, 208 (1987). That court held that "[p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper." In *Richter*, the prosecutor not only asked the defendant if the FBI agent was lying, he also called another FBI agent to corroborate the first agent's testimony, "which the prosecutor already had forced the defendant to label" as a lie. The prosecutor then compounded the error in his final argument, focusing on the differences between the testimony of Richter and the FBI agents and arguing that "if [the jurors] find that the FBI agents are telling the truth, then Mr. Richter is guilty and his guilt has been established." The prosecutor concluded by rhetorically asking the jury why two experienced FBI agents would "commit perjury and risk their careers to get Mr. James Richter." 826 F.2d at 208–09. The court found "plain and prejudicial error" and reversed. 826 F.2d at 207.

In subsequent cases, the Second Circuit has adhered to the basic principle that it is improper for a prosecutor to compel a defendant to state that the law enforcement officers testifying against him or her are lying. The court has made clear, however, that each case must be analyzed to determine if the improper cross-examination was prejudicial. *See United States v. Gaind*, 31 F.3d 73, 77 (1994); *United States v. Weiss*, 930 F.2d 185, 195, *cert. denied*, 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991); *United States v. Scanio*, 900 F.2d 485, 492–93 (1990), *overruled on other grounds, Ratzlaf v. United States*, 510 U.S. 135, 136 n. 1, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *see generally United States v. Williamson*, 53 F.3d 1500, 1522–23 (10th Cir.1995) (analyzing Second Circuit's application of *Richter*).

Three other circuits have expressly adopted the *Richter* principle. *See United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir.1999); *United States v. Sullivan*, 85 F.3d 743, 749–50 (1st Cir.1996); *United States v. Boyd*, 54 F.3d 868, 871 (D.C.Cir.1995). In *Williamson, supra* at 1523, the Tenth Circuit declined to decide whether to adopt the *Richter* principle, but remarked that it was

"not particularly persuaded by the reasoning of the court in *Richter*." In *United States v. Bryant*, 770 F.2d 1283, 1291 (5th Cir.1985), *cert. denied*, 475 U.S. 1030, 106 S.Ct. 1235, 89 L.Ed.2d 343 (1986), the Court of Appeals held:

> We cannot say that Bryant is prejudiced when he is given an opportunity to affirm that contradictory testimony is fallacious. The error, if any, is harmless.

*United States v. Cole*, 41 F.3d 303, 309 (7th Cir.1994), *cert. denied*, 516 U.S. 826, 116 S.Ct. 94, 133 L.Ed.2d 49 (1995), appears to have carved out an exception to the *Richter* principle. The court acknowledged that credibility of witnesses is the province of the jury, but held that it was not improper to ask the defendant if the witnesses against him had any motive to lie after he opened the door on direct examination by repeatedly raising "questions of the character and credibility of government witnesses."

In our view, the *Richter* principle, applied on a case-by-case basis, represents the weight of authority and is consistent with our jurisprudence. Applying that principle, we conclude that there was no plain error.

█ With respect to trial counsel's questions whether appellant's three co-actors (Spencer, Lynk, and Gibson) were lying, we conclude that appellant was not prejudiced. Defense counsel announced in his opening statement that appellant was framed by Spencer and Lynk. He asserted that Gibson was a "spurned woman," implying that she was bent on revenge. Defense counsel adhered to this theme in closing arguments. For trial counsel to force appellant to acknowledge under oath what his counsel had already asserted was harmless error. See *United States v. Cole, supra.*

█ With respect to the questions whether CWO Gorman was lying, appellant did not take the bait. He refused to call CWO Gorman a liar, insisting instead that CWO Gorman did not know who typed the shopping lists and that CWO Gorman changed the procedures. While the questions were improper, the answers were harmless.

Similarly, with respect to questions regarding appellant's fingerprints on the checks, appellant declined to call the witnesses against him liars, testifying that he did not know if he was authorized to handle the checks. Regarding the question whether appellant brought the entire trash can containing a missing check to the company offices, he declined to call Cpl Saenz–Ortega a liar. Instead, he simply insisted, "Ma'am, there was a trash can involved in the situation."

Finally, even though appellant was induced to testify repeatedly that SA McKenzie was lying, we hold that the error was harmless. Appellant did not dispute that the agents found the envelope somewhere, and, consistent with his theory that he was framed, he speculated that it must have been placed in the vase at work. He also suggested that Ms. Gibson had the opportunity to plant the envelope in the vase when she transported his personal effects from his office to his residence.

In summary, the record shows that appellant was confronted with the testimony of his three co-actors, corroborated by the physical evidence seized from his residence, documentary evidence in his car, and his fingerprints on 12 of the forged checks. His defense was that his co-actors were lying in an effort to frame him. Trial counsel's questions, although improper, merely reinforced the defense theory. Under these circumstances, we hold that the court below did not err when it concluded that appellant was not prejudiced by trial counsel's improper cross-examination.

### ISSUE II: TRIAL COUNSEL'S SENTENCING ARGUMENT

#### Facts

Trial counsel's sentencing argument included the following comments:

> Trust and honor. You heard those words from several people who came in this courtroom. Not from the accused. Trust and honor are what Marines stand proud on. Trust and honor.

> * * *

> The Marine Corps trusted a sergeant. Trusted a sergeant with numerous responsibilities. What did he do? He took advantage of Separations Company. He took advantage of each and every Marine in that company when he fooled them, and then he came up here and he lied about their involvement.

> He lied about Corporal Saenz–Ortega and Corporal Thomas. . . .

> Think about those Marines and how they feel being investigated. They're responsible for those checks. Consider that. Consider those junior Marines. He's a thief and a liar who's taken advantage of them.

> * * *

> He's a thief, a liar, and the ringleader who was involving other Marines in his acts. And he was stealing from Marines who had served honorably.

> * * *

> You, as members, are going to determine his fate. He's a thief and a liar. . . .

> * * *

> Consider: "Ye shall not steal, neither deal falsely, neither lie one to another." Leviticus, Chapter 9, Verse 11. . . .

> * * *

> The Marine Corps does, in fact, stand for honor. It stands for trust. It stands for everything that we in the Marine Corps are proud of.

> * * *

> Dishonorable Discharge is the only way this Marine should get out of the Marine Corps.

> He lied to you, gentlemen. He lied on that stand, and he lied to you. Each and every one of you, he lied to you. Dishonor. Dishonorable discharge.

> He has no rehabilitative potential. No way. And he's got to be punished.

Punish him with confinement. Twenty-five victims, 25 checks, 25 years. Twenty-five years, and you send that message to each and every Marine at Camp Pendleton. Twenty-five years, and it's going to hit him that he's actually done something wrong.

\* \* \*

Fine him. Fine him. Fine this thief, and fine this liar. Fine him $50,000.

Twenty-five years confinement; a dishonorable discharge; and $50,000 fine for everything that he's done to malign the United States Marine Corps, for the horrible example that he has set, what society have seen. And send that message to those sergeants in the Marine Corps, to everyone in the Marine Corps, that what it means to be a Marine is something sacred and important.

Thank you, gentlemen.

Defense counsel did not object to any of the above comments or request a curative instruction. Defense counsel did object, however, to trial counsel's asking the members to think about the impact on other Marines who were investigated as a result of appellant's misconduct. The military judge sustained this objection and gave a curative instruction.

The military judge's instructions on sentencing included the following limiting instructions:

No person, including the accused, has the right to seek to alter or affect the outcome of a court-martial by false testimony. You're instructed that you may consider this issue only within certain constraints.

First, this factor should play no role whatsoever in your determination of an appropriate sentence unless you conclude that the accused did lie under oath to the court.

Second, such lies must have been in your view willful and material before they can be considered in your deliberations.

Finally, you may consider this factor insofar as you conclude that it, along with all other circumstances in the case, bears upon the likelihood that the accused can be rehabilitated.

You may not mete out additional punishment for the false testimony itself.

During argument, trial counsel and defense counsel recommended that you consider a specific sentence or parts of the sentence in this case. You're advised that the arguments of counsel and their recommendations are only their individual suggestions and may not be considered as the recommendation or opinion of anyone other than such counsel.

Appellant and *amicus curiae* now argue that trial counsel's sentencing argument was plain error, because she improperly asked the members to punish appellant for lying. Final Brief at 10–11; Amicus Brief at 13. At one point in its brief, the Government concedes that the argument was improper, but argues that it does not rise to the level of "plain error because appellant suffered no prejudice." Answer at 3. At another point, however, the Government asserts that "trial counsel's argument was not error." Answer at 10.

*Discussion*

█ It is well established that "a trial counsel 'may strike hard blows, [but] he [or she] is not at liberty to strike foul ones.'" *United States v. Stargell*, 49 MJ 92, 93 (1998), quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). RCM 1001(g), Manual, *supra*, provides: "Failure to object to improper argument before the military judge begins to instruct the members on sentencing shall constitute waiver of the objection." To overcome waiver, appellant must convince this Court that the argument was error, that the error was plain or obvious, and that the error materially prejudiced his substantial rights. *United States v. Powell*, 49 MJ 460, 464–65 (1998).

In *United States v. Warren*, 13 MJ 278 (1982), this Court held that an appellant's mendacity may be considered in sentencing, subject to certain limitations. When sentencing is by members, the military judge must instruct the members that they may not consider trial counsel's mendacity argument "unless they conclude that the accused *did* lie under oath to the court" and that

"such lies must have been, in [the members'] mind, 'willful and material.'" Finally, the members may consider an accused's mendacity "only insofar as they conclude that it, along with all the other circumstances in the case, bears upon the likelihood that the accused can be rehabilitated." The court members "may *not* mete out additional punishment for the false testimony itself." 13 MJ at 285–86 (all emphasis in original).

Court members are presumed to follow the military judge's instructions. *See United States v. Garrett,* 24 MJ 413, 418 (CMA 1987), citing *United States v. Ricketts,* 1 MJ 78, 82 (CMA 1975). This Court has recognized that an improper argument can often be cured by an appropriate limiting instruction. *See, e.g., Stargell,* 49 MJ at 94; *United States v. Vasquez,* 48 MJ 426, 430 (1998).

Applying the foregoing principles to trial counsel's argument in this case, we hold that there was no plain error. Although trial counsel repeated called appellant a thief and a liar, defense counsel did not find the argument sufficiently offensive to warrant an objection or a request for a curative instruction. The military judge's detailed and appropriate limiting instruction cured any possible error in trial counsel's sentencing argument.

### Decision

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

CRAWFORD, Chief Judge (concurring in the result):

### FACTS

When cross-examining appellant, the prosecutor asked on numerous occasions whether the other witnesses were lying. On only one occasion did defense counsel deem it necessary to interpose an objection, and then the objection was only as to vagueness regarding "lying," which was sustained ·by the judge. The issue in this case centers around that cross-examination.

### ANALYSIS

Issue I is a simple question on its face, but an extremely complex matter when analyzed. First, there is the constitutional issue of whether cross-examination which asks a criminal defendant to state that prosecution witnesses are lying infringes upon the Fifth Amendment's prohibition against compelled testimony. I find no constitutional violation in this case.

### I. THE FIFTH AMENDMENT

There are at least two interpretations of the Fifth Amendment prohibition. The first is that it gives an individual the "unfettered" right to exercise his own free will to speak. *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), quoting *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The second recognizes that it only prohibits compulsion and coercion. *See* Joseph D. Grano, *Confessions, Truth, and the Law* 141–43 (1993).

The Fifth Amendment firmly states that no person shall be compelled in any criminal case to be a witness against himself. A person who voluntarily testifies gives up this Fifth Amendment protection. There are several Supreme Court cases which illustrate this waiver principle.

The Amendment does not say that if the witness is questioned pretrial, or I would suggest at trial, he or she cannot be questioned concerning his or her non-verbal communication. A party should be able to ask about circumstances and inferences from circumstances that the jurors could draw upon if left to their own conclusions. If silence "[f]rom time immemorial" may be evidence of guilt, as it was in *State v. Bartlett,* 55 Me. 200, 217 (1867), certainly the timing of silence may or may not be the same. While the Supreme Court has remarked on the inviolability of the human personality, *Murphy v. Waterfront Commission of New York Harbor,* 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Court has also recognized that the privilege against self-incrimination does not apply if an individual has been given immunity to protect the individual from having a properly seized diary admitted

in evidence against him. In the end, the Fifth Amendment protects against compulsion and coercion. When and if to testify is a decision to be made by the accused and his or her attorney.

The lesson that one can draw from years of precedents is that the Supreme Court seeks only to eliminate coerced confessions. Coercion is not present here. If coercion were present, it could be detected by the factfinder. Here, appellant did not exercise his constitutional privilege of silence either during the pretrial stages of the case or at trial itself. Thus, even under the most protective view, that is protecting the exercise of free will, there can be no violation of the Fifth Amendment or Article 31, UCMJ, 10 USC § 831, in this cross-examination. As we have recognized in *United States v. Solis,* 46 MJ 31 (1997), there are two choices: remain silent or tell the truth. Here, appellant sought to take a third road. Once he did, it was not only proper to comment on the improper conduct, but also the burden was on the Government to prove that conduct beyond reasonable doubt.

## II. GRIFFIN TO MITCHELL

In 1965 the Supreme Court held that prosecutorial or judicial comment on the defendant's refusal to testify violated his Fifth Amendment privilege. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). To invite a factfinder to draw an inference adverse to a defendant, solely on account of the defendant's assertion of a constitutional right (refusal to testify), impermissably burdens the free exercise of the right.[1]

One year later in *Miranda, supra* at 444, 86 S.Ct. 1602, the Court extended this right to "custodial interrogation" by law enforcement officials. *Cf. Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). However, statements made after proper warnings in response to police interrogation could be used against a suspect at trial as part of the prosecution's case. Similarly, the Court has held that a testifying defendant could be cross-examined

about his pretrial silence when there properly have been no prior rights' warnings, including informing the defendant of the right to remain silent. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *see also Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982).

In 1980 the High Court held that a defendant who chooses to make a statement after appropriate warnings may be impeached at trial with the content of that pretrial statement and will not be able to assert that any inconsistency or omission was a partial invocation of his right under the Fifth Amendment. *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980); *see also Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926) (a defendant who did not testify at his first trial but did testify at the second trial can be cross-examined concerning his failure to testify at the prior trial on the same charge).

In *Mitchell v. United States,* 526 U.S. 314, 329, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), the Court, in a 5–4 opinion, declined to retreat from *Griffin* and *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and held that Mitchell retained the privilege against compelled self-incrimination at her sentencing hearing even though she had pled guilty. Justice Scalia authored the dissent, rejecting the extension of what the author found to be historically flawed logic in *Griffin* to the penalty phase of a trial. 526 U.S. at 332, 119 S.Ct. 1307. The dissent argued that exercising one's constitutional rights and privileges should not require someone to ignore logical inferences that might flow therefrom. *Id.* at 341, 119 S.Ct. 1307.

## III. PORTUONDO V. AGARD

A year later, in *Portuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), the Supreme Court in a 7–2 decision authored by Justice Scalia held that there was no constitutional violation for the prosecutor to argue that the accused, even though required to be present at trial under state

---

1. 380 U.S. 609, 612, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

law, testified last so he could tailor his testimony.

Justice Scalia noted that the defendant's "argument boils down to a request ... [to] extend ... the rationale of *Griffin.*" The Court declined to accept this invitation. *Id.,* 120 S.Ct. at 1123. Justice Scalia placed the burden on a defendant who claims a constitutional violation to show historically that the comments made in this case were not appropriate. He remarked:

> Lacking any historical support for the constitutional rights that he asserts, respondent must rely entirely upon our opinion in *Griffin.* That case is a poor analogue, however, for several reasons. What we prohibited the prosecutor from urging the jury to do in *Griffin* was something *the jury is not permitted to do.* The defendant's right to hold the prosecution to proving its case without his assistance is not to be impaired by the jury's counting the defendant's silence at trial against him—and upon request the court must instruct the jury to that effect....

*Id.* at 1124 (emphasis in original).

He also noted that the jury could consider that appellant was tailoring his testimony; thus, it would be natural to question the defendant about it. "By contrast, it *is* natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance of fact that he heard the testimony of all those who preceded him." (Emphasis in original.) The jury should not be required to "blot[ ] out from its mind the fact that before giving the testimony the defendant had been sitting there listening to the other witnesses." *Id.* at 1124. Justice Scalia noted: "The dissent seeks to place us in the position of defending the proposition that inferences that the jury is free to make are inferences that the prosecutor must be free to invite." He goes on: "Similarly, the dissent seeks to place us in the position of defending the proposition that it is more natural to infer tailoring from presence than to infer guilt from silence." He continued that "[t]he quite different point we do make is that inferring *opportunity to tailor* from

presence is inevitable, and prohibiting that inference (while simultaneously asking the jury to evaluate the veracity of the defendant's testimony) is demanding the impossible—producing the other alternative respect in which this case differs from *Griffin.*" *Id.,* n. 1 (emphasis in original).

The *Portuondo* majority rejected the argument that *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), was to the contrary. 120 S.Ct. at 1125–26. There the Court found it to be unconstitutional to require the defendant to testify first. The Court also rejected the argument that the questions and argument "were impermissible because they were 'generic' " and not "based upon any specific indication of tailoring." *Id.* at 1126.

Justice Scalia remarked that the majority was ruling on a constitutional question and not on what is "a matter of sound trial practice." He would leave for another day the question of what judicial instructions would be best under these circumstances. *Id.* at 1127 n. 4.

Justice Ginsburg dissented and asserted that the "Court of Appeals took a carefully restrained and moderate position in this case." *Id.* at 1130. She said:

> A prosecutor who wishes at any stage of a trial to accuse a defendant of tailoring specific elements of his testimony to fit with particular testimony given by other witnesses would, under the decision of the Court of Appeals, have leave to do so. Moreover, on cross-examination, a prosecutor would be free to challenge a defendant's overall credibility by pointing out that the defendant had the opportunity to tailor his testimony in general.... Thus, the decision below would rein in a prosecutor solely in situations where there was no particular reason to believe that tailoring has occurred and where the defendant has no opportunity to rebut the accusation.

\* \* \*

> If accused on cross-examination of having tailored their testimony, those defendants might display signals of untrustworthiness that it is the province of the jury to detect

and interpret. But when a generic argument is offered on summation, it cannot in the slightest degree distinguish the guilty from the innocent. It undermines all defendants equally and therefore does not help answer the question that is the essence of a trial's search for truth: Is this particular defendant lying to cover his guilt or truthfully narrating his innocence?

In addition to its incapacity to serve the individualized truth-finding function of trials, a generic tailoring argument launched on summation entails the simple unfairness of preventing a defendant from answering the charge.... A prosecutor who can withhold a tailoring accusation until summation can avert such a rebuttal.

*Id.* at 1130–31 (citation omitted).

Under either the majority or dissenting views in *Portuondo,* there was no violation of Jenkins' Fifth Amendment right in this case.

### SIXTH AMENDMENT

There is a cluster of rights that exists in the Sixth Amendment, including the right to know "the nature and cause of the accusation," the right of confrontation, and the right of compulsory process. These rights center on the right to a fair trial, truth seeking, and the presumption of innocence. The right of confrontation is the Public Trial Clause that protects both defendants and the public at large. The key purpose of the Confrontation Clause—to discourage deliberate perjury by prosecution witnesses and to allow a defendant to hear witnesses' stories—may help an innocent defendant to determine why a witness is mistaken. In this respect, the Confrontation Clause amplifies the theme of knowing the "nature and cause of the accusation."

The Confrontation Clause allows the defendant not only to hear the witness' story, but also to question and cross-examine on what the witness has said. Because the Confrontation Clause focuses on truth finding, it has as its neighbor the Compulsory Process Clause.

The Supreme Court has stated "the Confrontation Clause's very mission" is promoting "the accuracy of the truth-determining process in criminal trials." *Tennessee v. Street,* 471 U.S. 409, 415, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), quoting *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

While the Clauses seem clear on their face, sometimes their interpretation and logic are not always so clear.

One of the reasons the defendant is present is to hear the witnesses and determine whether they are mistaken. Certainly, the jury is going to contrast what the witnesses are saying and contrast their testimony with that of the defendant who takes the witness stand. While the prosecutor may not use silence against the defendant, this does not mean the defendant who is there to question the witnesses cannot be asked about it.

It also should be noted that the Supreme Court has indicated: "The primary object of the [Confrontation Clause] was to prevent depositions or *ex parte* affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness[.]" *Mattox v. United States,* 156 U.S. 237, 242, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

Under the Compulsory Process Clause the witness can be brought in and questioned against his or her will, but that does not mean that the prosecution may not pit the witness against the defendant who eventually decides to testify. One of the major purposes of the Sixth Amendment is to deter and detect perjury and other frauds that are perpetrated upon the trier of fact.

However, this is not a Sixth Amendment case at all. This is a case about an accused electing to testify and about a prosecutor confronting, through cross-examination, that accused to ensure the integrity of the fact-finding process. This is exactly what a trial is all about.

Trial counsel never asked appellant whether he had doctored up his testimony after listening to all of the witnesses that had gone before him. What the prosecutor did through her questioning of the accused was analogous to commenting on the testimony of others and the reasonable inferences that a

factfinder could draw from that testimony. As the case of *People v. Buckey*, 424 Mich. 1, 378 N.W.2d 432 (1985), shows, a prosecutor can always comment on testimony, draw inferences from it, and argue that any witness, including the defendant, is not worthy of belief, which means they're lying.

Here the court members sat through all of the testimony from the government and defense witnesses. Testimony from the government witnesses was diametrically opposed to that given by appellant. The only logical inference that could be drawn at this stage of the trial was that somebody was not telling the truth, *i.e.*, was prevaricating. The fact that somebody was lying is not only a reasonable inference, but it is the *only* logical inference. Accordingly, asking the accused who is telling the truth cannot possibly violate any constitutional norm or disparage the accused for exercising one of his constitutional rights.

The most troubling aspect of this case is the lower court's finding that the type of cross-examination used by the prosecutor, asking appellant on several occasions whether the other government witnesses were "lying" when they testified in the Government's case, and asking appellant on three other occasions if the witnesses made their testimony up, was improper. The lower court held that "[c]ross-examination which compels an accused to state that prosecution witnesses are lying is improper impeachment and opinion testimony. As such it was inadmissible under Military Rule of Evidence 402." The lower court cited *Floyd v. Meachum*, 907 F.2d 347, 354–55 (2d Cir.1990), as authority for this proposition. 50 MJ at 580.

The Court of Criminal Appeals has misread that case. In *Floyd*, the crux of the prosecutor's misconduct was to use "repeated references to the Fifth Amendment" to draw attention to the accused's election not to testify. 907 F.2d at 353. More to the point, the prosecutor in *Floyd* "characterized" the defendant, "who did *not* testify, as a liar literally dozens of times" throughout her summations. *Id.* at 354 (emphasis added). Finally, the prosecutor's arguments attempted somehow to use Floyd's pretrial statements to dilute her burden to prove him guilty beyond a reasonable doubt. *Id.* at 354.

I am satisfied that there was no error in trial counsel's asking this appellant, albeit repetitiously, whether the Government's witnesses were liars. All she was doing is asking him if he really meant what he was saying.

## PROSECUTORIAL MISCONDUCT

The majority decides this case on the issue of prosecutorial misconduct, and having adopted the rationale of *United States v. Richter*, 826 F.2d 206 (1987), applies *Richter's* principles to this case. I find it unnecessary to adopt *Richter*.

In *Richter*, the Second Circuit held that it was improper for the prosecutor to ask the defendant on cross-examination to testify whether the police officers who previously testified were lying. Even though the questioning permitted the defendant to brand the agent's "testimony as either a lie or a mistake," and despite the absence of objection, the Second Circuit found the impropriety to constitute reversible error. The court found prejudice in the following facts: (1) the prosecutor called a second FBI agent in rebuttal to corroborate testimony which the defendant had branded as a lie; (2) the prosecutor made misstatements in his summation which "emphasiz[ed] the improper nature of the questions he had forced [the defendant] to answer"; (3) the prosecutor misled the jury by suggesting that guilt hinged on the truthfulness of the FBI agents; (4) prosecutors generally have been cautioned by that Circuit "to avoid" arguing "that, if the defendant is innocent, government agents must be lying." 826 F.2d at 208–09.

In *United States v. Gaind*, 31 F.3d 73 (1994), the Second Circuit indicated it did "not regard *Richter* as controlling the decision of this case." *Id.* at 77. The court distinguished *Richter* based on the "significant difference" between asking the defendant whether the witness was lying or whether the witness was simply mistaken, a distinction recognized in *Richter*, and the fact that the witnesses whose testimony were in issue, were not law enforcement agents.

It is quite clear that "the Second Circuit has been very reluctant to expand the scope of the *Richter* decision beyond its narrow and specific facts." *United States v. Williamson,* 53 F.3d 1500, 1523 (10th Cir.1995). In *Williamson,* the court noted that the prosecutor did not "call a rebuttal witness to emphasize the cross-examination of the defendant." In the end, the Tenth Circuit did not have to rule on *Richter.* In essence, *Richter* was the Second Circuit's continuing to show its frustration with possible sanctions against prosecutors. *See The Second Circuit Reacts to Prosecutorial Misconduct,* 49 Brooklyn L.Rev. 1245 (1983).

In *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the Supreme Court said that, to justify reversal, it is not enough that the prosecutor's remarks or conduct were improper; the relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." The Court has emphasized in numerous cases that it would not readily overturn a conviction based on a prosecutor's comments alone. *See, e.g., United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *United States v. Hasting,* 461 U.S. 499, 505–07, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)(Court should not reverse a conviction when the Government's case is overwhelming). Based on the judge's instructions, any misstatement by the prosecutor would have little impact on the jury. *United States v. Laboy–Delgado,* 84 F.3d 22, 30 (1st Cir.1996).

While prosecutors should avoid making unfair and improper comments, they can recognize what is readily apparent to the jurors. *United States v. Warren,* 13 MJ 278 (CMA 1982).

ISSUE II—Facts

Trial counsel opened her sentencing argument by stating that "honor" and "trust" are Marine values and by contrasting appellant as a "thief" and a "liar." No objection was lodged that the argument improperly invited the members to punish appellant for perjury and no limiting instructions were requested.

Notwithstanding the absence of a request, the military judge gave the following instruction during his sentencing instructions:

> No person, including the accused, has a right to seek to alter or affect the outcome of a court-martial by false testimony. You're instructed that you may consider this issue only within certain constraints. First, this factor should play no role whatsoever in your determination of an appropriate sentence unless you conclude that the accused did lie under oath to the court. Second, such lies must have been in your view willful and material before they can be considered in your deliberations.
>
> Finally, you may consider this factor insofar as you conclude that it, along with all other circumstances in the case, bears upon the likelihood that the accused can be rehabilitated.
>
> You may not mete out additional punishment for the false testimony itself.

There was no objection to this instruction as given. Thus, in the absence of plain error, any objection to improper argument was waived. RCM 1001(g). In any event I find no error in trial counsel's sentencing argument in this case, especially in light of the military judge's limiting instructions following argument. If, as the majority seems to find, there was any impropriety in trial counsel's sentencing argument, it certainly does not rise to the level of plain error. *See United States v. Powell,* 49 MJ 460 (1998).