****CORRECTED COPY – DESTROY ALL OTHERS****

## UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

### Airman First Class COREY K. HUDGINS
### United States Air Force

### ACM 38305

### 03 April 2014

Sentence adjudged 9 November 2012 by GCM convened at Kirtland Air Force Base, New Mexico. Military Judge: W. Shane Cohen (sitting alone).

Approved Sentence: Dishonorable discharge, confinement for 11 years, and a reprimand.

Appellate Counsel for the Appellant: Major Zaven T. Saroyan and William E. Cassara, Esquire.

Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Major Rhea A. Lagano; Major Daniel J. Breen; and Gerald R. Bruce, Esquire.

Before

HELGET, WEBER, and PELOQUIN
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

WEBER, Judge:

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of two specifications of abusive sexual contact; one specification of rape; one specification of forcible sodomy; and one specification of assault consummated by a battery, in violation of Articles 120, 125, and 128, UCMJ, 10 U.S.C. §§ 920, 925, 928. The adjudged and approved sentence consisted of a dishonorable discharge, confinement for 11 years, and a reprimand.

The appellant raises nine issues on appeal: (1) Whether the military judge erred in failing to disclose constitutionally required portions of the mental health records of one of the alleged victims, Airman First Class (A1C) PS; (2) Whether the appellant was denied a fair trial when the military judge refused to grant a mistrial; (3) Whether the military judge abused his discretion in denying the appellant's motion to sever charges; (4) Whether the military judge erred by failing to merge Specification 3 of Charge I with Charge II in findings due to an unreasonable multiplication of charges; (5) Whether the military judge committed plain error when he permitted the trial counsel to question the appellant about the truthfulness of other Government witnesses; (6) Whether the military judge committed plain error in admitting and considering evidence that A1C PS's boyfriend did not think A1C PS was being dishonest when she claimed she had been assaulted; (7) Whether the record of trial is incomplete under Article 54, UCMJ, 10 U.S.C. § 854, due to failure to include the Government's response to the appellant's motion to sever as an appellate exhibit; (8) Whether the cumulative effect of errors in the court-martial denied the appellant a fair trial and a fair sentencing hearing; and (9) Whether the evidence is factually insufficient to support a finding of guilty on any of the offenses. We find no error materially prejudicial to a substantial right of the appellant, and affirm.

*Background*

At the time of trial the appellant was a 23-year-old stationed at Kirtland Air Force Base (AFB). He enlisted in the Air Force in January 2011.

The appellant met A1C DB, a female Airman also stationed at Kirtland AFB, in the fall of 2011. Both he and A1C DB had been in the Air Force for less than a year when they met, and they promptly struck up a sexual relationship. A1C DB did not want a romantic relationship, but she did consensually engage in sexual intercourse with the appellant about five times over the course of three to four months. Sometime around Thanksgiving A1C DB discovered the appellant had a child and a girlfriend, so she broke off contact with him. They had little contact with each other until February 2012, when they renewed their friendship. For the next few months, the friendship continued. They spent several nights together after their friendship renewed and would "cuddle," but they did not have sexual intercourse during this time, and A1C DB repeatedly told the appellant that she did not want a sexual relationship. A1C DB nonetheless characterized their relationship during this time as "confusing," as neither of them "knew what was really going on."

One such overnight encounter took place in A1C DB's room in early May 2012. This time, A1C DB characterized the appellant's behavior as "a little more pushy than normal" and "very persistent" in repeatedly trying to touch her genitals. A1C DB did not order the appellant to leave her room because she trusted him and "felt like [she] had the

situation under control." She successfully diverted the appellant's attention and spent the remainder of the night with him without further incident.

About two weeks later, A1C DB and her best friend, AI, headed out to a local night club. Although she was under the age of 21, A1C DB had about two 16-ounce "Four Loco" drinks before departing for the night club. The two spent time at the club, ate some food, returned to A1C DB's dormitory room on base to change clothes, and spent some time at the smoke pit. A1C DB and AI met the appellant briefly while eating, and the appellant showed up for a time at the smoke pit pursuant to AI's text message invitation. The appellant sat quietly by himself at the smoke pit before leaving, which A1C DB noticed as abnormal behavior for him. As a result, A1C DB tried to call the appellant, and she also sent a text message to the appellant stating, "Come to my room in 5. But you have to leave at 8 i work. And no moves lol." When she received no answer, she and AI went to his dormitory room. They knocked on his door, and when he did not answer, they proceeded to the window of his first-floor room, where A1C DB and AI removed the screen. They found the appellant asleep and woke him up, and after the appellant opened the door and let the two women in his room, the women invited the appellant back to A1C DB's room.

At A1C DB's room the three were joined by two other male Airmen, and they socialized for about 15 to 20 minutes. They then realized that the sun was rising and that they needed to get to sleep, so the two other Airmen and AI departed. A1C DB told the appellant he could stay with her, but consistent with her earlier text message, she falsely told him she had to rise at 0800 hours, since she did not want him staying with her all day. By this point, it was about 0600 hours. She also reiterated that she was not going to have sex with the appellant and warned him, "no moves." The appellant and A1C DB got into A1C DB's bed together and after talking and laughing for a while, A1C DB began to fall asleep with her back to the appellant and the appellant "spooning" her. This activity appeared to be consensual.

The appellant then rolled A1C DB onto her back and began kissing her. A1C DB responded, "No. We are not hooking up. What did you not get about that?" As A1C DB lay on the bed, the appellant touched her buttocks and legs, and she again rebuffed his attempts at such contact. A1C DB rolled over with her back to the appellant and fell back asleep, but awoke when the appellant said he was leaving because he could not "just stay here and not have sex with [A1C DB]." A1C DB told the appellant he was free to leave, but he decided to remain. She did not feel threatened by him at that time because he had heeded her instructions concerning other times she did not wish to be intimate with him.

A1C DB again fell asleep, but awoke to find the appellant's hand inside her pants touching her buttocks. He then moved his hands toward her genitals, and she moved his hands away. The appellant repeated his attempt to touch her genitals, tried to take off her pants, and he "kept getting forceful with it," so A1C DB turned toward the

appellant to confront him. As she did that, he began pulling her pants off and A1C DB also saw that the appellant was masturbating with his free hand. A1C DB falsely told him she was intoxicated and needed to vomit, which allowed her to quickly extricate herself from the situation and go to the bathroom. Either in bed or as A1C DB exited the bed, her sweatpants (which the appellant had begun removing) came off. A1C DB remained in the bathroom for a minute or two before returning to the bed. At that point, she felt "more annoyed than anything," but "felt like [she] had the situation under control" because she trusted him and had been able to successfully repel his advances in the past.

A1C DB pretended to fall asleep immediately after returning to the bed. At that point, the appellant was clad only in a t-shirt with his bottom half fully exposed. As A1C DB lay with her back to the appellant, he pulled her right arm back and placed it on his penis. A1C DB let her hand drop, still pretending to be asleep, but the appellant continued to place her hand on his penis and then finally began masturbating using her hand. The appellant then dropped A1C DB's hand and reached over to touch her vagina, but she repeatedly moved his hand away. After his repeated attempts to touch her vagina, A1C DB turned toward him, put her hands up, and said, "What the f*ck, Corey?"

The appellant grabbed both of A1C DB's wrists at that point and pinned her to the bed. As she began saying "no," the appellant released one of A1C DB's wrists and inserted his finger into her vagina. A1C DB used her free hand to push away from the appellant while still in the bed, but she backed herself up against a wall. As A1C DB turned away from him in the fetal position, the appellant pulled her underwear off, pried her legs open, and penetrated her. A1C DB repeatedly said "no" while she was crying, but lay still out of resignation that her resistance was ineffective. After about a minute, the appellant ejaculated, got up, dressed, pulled A1C DB toward the middle of the bed and covered her, asked A1C DB if she was mad at him and if he could call her, and left.

A1C DB immediately called her friend AI, went to meet her, and told her what happened. AI encouraged her to report it, but A1C DB did not do so immediately because she did not want to report she had consumed alcohol under the age of 21. After carrying out some routine activities and talking to her sister over the telephone about the incident, A1C DB reported the alleged sexual assault less than 24 hours after the event. Subsequent examination found injuries consistent with A1C DB's report, including bruises on her wrists and legs. A1C DB also reported that she experienced vaginal bleeding after the incident, which was not normal for her following consensual intercourse. A forensic examination of A1C DB and subsequent testing revealed semen taken from A1C DB matched the appellant's profile.

Soon after A1C DB reported this incident, another female Airman came forward to report the appellant sexually assaulted her several months earlier in August or September 2011. A1C PS was newly assigned to Kirtland AFB, having just arrived from

technical training school. She had briefly met the appellant at technical training school, but had no meaningful interaction with him there. Soon after she arrived at Kirtland, the appellant sent her a text message offering to sell her a DVD. Since she had not provided her cell phone number to the appellant, she assumed the appellant obtained the number from a unit recall roster. A1C PS agreed to buy the movie, and went to the appellant's dormitory room and paid cash for it. A1C PS then became interested in another movie playing on the appellant's television, so she sat on the floor near the appellant's recliner to watch it while the appellant sat in the recliner.

A1C PS reported that after about five minutes, the appellant reached over, touched her leg, and then touched her inner thigh in an upward motion toward her vaginal area. A1C PS did not remember if he actually touched her genitals through the clothes, but she panicked and tried to turn around and stand up to confront him. As she turned around and got on her knees to stand up, the appellant grabbed the back of her neck and pulled it toward his exposed penis. A1C PS tried to pull back but as she opened her mouth to yell at him to stop, he inserted his penis into her mouth. A1C PS reacted by starting to bite the appellant's penis, but as she began to do so, he hit the back of her head. A1C PS did not know if the appellant hit her with an open palm or a clenched fist, but she described the hit as "hard enough to scare me." A1C PS stated that this placed her in sufficient fear that she felt compelled to keep her mouth on his penis for the next 10 to 15 minutes, and as he sat down in the recliner, she moved forward and continued to keep her mouth on his penis out of fear that he would hit her again. At some point, she suspected that he was inebriated and about to fall asleep, so she waited for him to fall asleep. A1C PS then exited the room, sat down in the staircase outside the appellant's room, and cried.

A1C PS did not report this incident immediately. A few weeks later, she started dating another Airman at Kirtland AFB, and that relationship became intimate. A1C PS later told her boyfriend what happened with the appellant because she was having nightmares about the incident. A1C PS's boyfriend encouraged her to report it, but she did not feel comfortable doing so at that time. Instead, she saw a counselor for a few months until she decided to make a restricted report to the Sexual Assault Response Coordinator (SARC) several months after the incident. A1C PS then changed her report to an unrestricted report about a week later, after she learned about A1C DB's allegations and the SARC encouraged her to make an unrestricted report to support A1C DB's case.

The appellant testified at trial and also provided an unsworn statement in the investigation pursuant to Article 32, UCMJ, 10 U.S.C. § 832. He averred that the intercourse with A1C DB was fully consensual and she actively participated in the activity. He testified that while he believed she was intoxicated and remembered A1C DB went to the bathroom purportedly to vomit from intoxication, he believed she consented to the intercourse because she had frequently been under the influence of alcohol when they had consensual intercourse in the past. He also testified that A1C DB's "no moves" comment did not convey lack of consent to him, because she had

previously "played hard to get" at first, only to later consent to sexual activity. Concerning A1C PS, he denied she performed oral sex on him the day he sold her the DVD. He did testify, however, that he and A1C PS had consensual intercourse on a later date. He stated the intercourse only lasted for "a minute and a half [to] two minutes," and he "wasn't really pleased with it and [he] wasn't really having a good time," so he told A1C PS he was tired and wanted to go to bed, ceasing the intercourse.

Further relevant facts are detailed for each assignment of error below.

*A1C PS's Mental Health Records*

Shortly before trial, defense counsel requested production of A1C PS's mental health records covering her active duty service. Defense counsel sought several pieces of information they believed were contained in the mental health records, including "where she talks about issues with her current boyfriend." The defense asserted this information was relevant and necessary because it would further the defense theory that A1C PS reported the sexual assault because her boyfriend might surmise it was consensual if she did not report it, possibly jeopardizing the relationship. The Government opposed producing her mental health records. The military judge reviewed A1C PS's mental health records in camera and determined none of the mental health records were relevant, at least in regard to findings.

Following the finding of guilty as to all charges and specifications, and in response to the testimony of a Government expert about post-traumatic symptoms A1C PS and A1C DB displayed, the military judge reopened findings and released certain medical and mental health records of A1C DB and A1C PS to the defense. This matter is more fully discussed in Issue II below. The defense did not receive all of A1C PS's medical or mental health records. The records provided generally contain A1C PS's positive impressions of her relationship with her boyfriend. However, one entry provided to the defense noted A1C PS rated her satisfaction with her relationship as four on a scale of five and noted that she experienced "differences, miscommunication, and different values" with her boyfriend. Several other mental health records not received by defense counsel covered A1C PS's relationship with her boyfriend. Those records generally noted A1C PS's satisfaction with the relationship and the fact that she looked to him as a source of emotional support. However, the records also contained entries noting concerns her boyfriend was too "controlling" or "bossy," he had a "double standard for women," and they had "almost nothing in common."

The appellant now alleges the military judge erred in not releasing excerpts of A1C PS's mental health records that indicate her boyfriend may have been controlling or bossy or held women to a different standard than men. He argues such records were constitutionally required for two reasons: (1) The defense could have used the records to counter A1C PS's testimony in the Mil. R. Evid. 412 hearing that her relationship with

her boyfriend was very strong; and (2) The statements in the mental health records could have supported the defense's theory that A1C PS fabricated the sexual assault allegation to cover up a consensual sexual encounter with the appellant out of fear that her boyfriend would be upset with her.

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Jenkins*, 63 M.J. 426, 428 (C.A.A.F. 2006) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)).

Mil. R. Evid. 513(a) states that "[a] patient has a privilege to refuse to disclose and prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist . . . in a case arising under the UCMJ, if the communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition." Mil. R. Evid. 513(d) contains certain exceptions to this privilege, including "when admission or disclosure of a communication is constitutionally required." Mil. R. Evid. 513(d)(8). The rule establishes procedures to determine the admissibility of patient records or communications. Generally, the rule requires a party seeking such records or communications to seek an interlocutory ruling from the military judge. Mil. R. Evid. 513(e)(1). The military judge conducts a hearing and examines the evidence or a proffer thereof in camera. Mil. R. Evid. 513(e)(2)-(3).

On appeal, the appellant requested oral argument on this issue, but provided no rationale for his request. This Court denied the motion, since the appellant did not provide good cause for the motion or indicate why oral argument would be helpful. Having fully evaluated the thorough briefs of the appellant and the Government, we find the military judge did not abuse his discretion in declining to provide the mental health record excerpts to the defense. Even assuming that he did err, we find any such error was harmless beyond a reasonable doubt.

Notably, the military judge <u>did</u> provide the defense counsel with one record in which A1C PS expressed some dissatisfaction with her relationship with her boyfriend, and the defense did not use it to impeach A1C PS. The released records contained an entry in which A1C PS rated her satisfaction with her relationship as four on a scale of five and noted she experienced "differences, miscommunication, and different values" with her boyfriend. The military judge reconsidered his findings of guilty after providing mental health records to the defense, and he allowed the defense to present additional evidence or cross-examine witnesses in findings. The defense cross-examined A1C PS again about matters contained in her mental health records, but defense counsel asked no questions about A1C PS's relationship with her boyfriend and did not use the mental health record entry to impeach her previous testimony that her relationship with her boyfriend was positive. Trial defense counsel's own actions therefore demonstrate that the additional evidence contained in A1C PS's mental health records was not so

probative as to be constitutionally required, or if it was required to be disclosed, its absence was harmless beyond a reasonable doubt.[1]

Other facts support our finding that this evidence was not constitutionally required and any error was harmless beyond a reasonable doubt. For example, the vast majority of the mental health entries that concerned A1C PS's relationship with her boyfriend spoke positively of their relationship. A1C PS repeatedly referred to her boyfriend as her primary source of support in dealing with the sexual assault and other stressors in her life, and she repeatedly expressed her gratitude to her boyfriend for his support and characterized their relationship positively. It is therefore unlikely that the evidence the appellant now alleges he should have received could have been so useful to the defense as to be constitutionally required or affect the outcome of the trial. In addition, the charged acts took place weeks before A1C PS's relationship with her boyfriend began. Even assuming A1C PS's boyfriend was controlling and had a double standard toward women, the relevance of such evidence is somewhat less when the event took place before he even had a relationship with A1C PS. Finally, the defense pursued two slightly different lines of attack to assert that A1C PS fabricated the sexual assault allegation in order to save her relationship with her boyfriend. The defense alternately suggested that A1C PS's boyfriend coerced her to report the encounter with the appellant as a sexual assault because he was a controlling person, or that A1C PS's relationship with her boyfriend was so good and important to her that she reported the sexual assault in order to preserve the relationship. To the extent that some of the statements in A1C PS's mental health records may have supported a theory that her boyfriend was controlling, those same statements would tend to somewhat undercut the defense theory that A1C PS fabricated the allegation because her relationship with her boyfriend was so good that she did not want to lose it.

We find no abuse of discretion in the military judge's refusal to disclose additional mental health records to the defense. Even assuming the military judge erred, such error was harmless beyond a reasonable doubt.

*Defense Motion for Mistrial*

As discussed above, in motions practice the defense sought production of portions of A1C PS's mental health records that were constitutionally required. During discussion with counsel on the motion before he reviewed the records, the military judge noted "[t]here is a difference in my mind between sentencing and findings," and disclosure of mental health records might be required for sentencing (for example, to rebut victim impact evidence), but not findings. The military judge advised the parties he would review the records only to determine what information should be disclosed for findings at

---

[1] The appellant has not alleged his trial defense counsel were ineffective in failing to cross-examine Airman First Class PS concerning these statements in her mental health records.

that point, and that he would revisit the issue in sentencing if applicable. The military judge then clarified exactly what defense counsel was seeking, and defense counsel specifically focused on four types of evidence: (1) any factual assertion A1C PS made about the allegations in the court-martial; (2) any statement regarding her relationship with her boyfriend, particularly any statement that might support the defense's theory that A1C PS falsely reported a sexual assault to preserve her relationship with her boyfriend; (3) any statement relating to the appellant's sale of the DVD to her; and (4) "any statement [A1C PS] may have made to a provider about prior sexual offenses that contradict[s] what she mentioned in court . . . ."

A1C PS had earlier testified in motions practice. After questioning by counsel, the military judge asked her whether she had ever previously been a victim of sexual assault. She replied affirmatively, and testified as to certain instances. However, when the military judge asked her if any other sexual assaults took place, A1C PS replied, "No, sir, not that I recall."

After reviewing several hundred pages of A1C PS's mental health records, the military judge stated he found nothing in her mental health records that was constitutionally required to be provided to the defense, at least for findings. Specifically concerning past allegations of sexual abuse, the military judge stated the following:

> In addition, there were very general references to a history of past sexual abuse during adolescent years by relatives or similar to what she had testified to in here. Once again, there were no specifics as to what occurred, how many times it occurred, those types of things, the level of specificity. And additionally the witness testified on the stand under oath this morning that none of those incidents were similar to the acts alleged here. There was nothing in the records to indicate that in fact any of those alleged acts of prior sexual abuse while she was an adolescent would've been similar in nature to anything that's alleged here.

Defense counsel did not further question or seek clarification of the military judge's ruling.

In findings, the Government called its expert psychologist, Dr. DL, to testify about responses exhibited by victims of sexual assault, including tonic immobility. Dr. DL did not testify in findings that he had actually examined either A1C PS or A1C DB, and he did not specifically testify as to responses by A1C PS or A1C DB. After the military judge found the appellant guilty of all charges and specifications, the Government recalled Dr. DL, who testified as to conditions commonly experienced by victims of sexual assault, including post-traumatic stress disorder (PTSD). He then testified that he

had interviewed or examined both A1C PS and A1C DB, and testified that both Airmen exhibited many symptoms consistent with PTSD.

After direct examination of Dr. DL, the military judge advised both parties that the Government had placed the mental health of A1C PS and A1C DB at issue in sentencing proceedings, and therefore he planned to disclose certain records to the defense. The military judge excused Dr. DL, stating that the defense could recall him and question him after reviewing the records the military judge would provide. However, he then allowed the Government to call A1C DB in sentencing to testify as to the effect of the appellant's actions upon her. The defense did not cross-examine A1C DB.

The military judge then re-reviewed A1C PS's mental health records as well as records pertaining to A1C DB. He released to the defense 35 pages of A1C PS's records, finding these were the only records "that would contain any reference to anything that I could even conceivably see as a possible contributing factor to her mental state." He also released 13 pages concerning A1C DB. The military judge gave the defense a recess to review these records and prepare any questions they might prompt for Dr. DL.

The defense moved for a mistrial following the recess. The defense asserted some of the records provided should have been disclosed in findings, because they contained evidence of other previous sexual assault allegations in addition to those A1C PS testified about, potentially providing a basis to impeach her. The military judge determined a possible contradiction was raised and the information should have been made available to the defense in findings. He then considered and rejected the defense's motion for a mistrial, finding a less drastic remedy was available and appropriate. He ruled that under Rule for Courts-Martial (R.C.M.) 924(c), it was appropriate for him to reconsider his findings and allow the defense to reopen its case in findings and present additional information. The defense availed itself of this opportunity, recalling two Government witnesses who had previously testified as to A1C PS's character for truthfulness to ask if it would change their opinion to learn she falsely testified in motions practice. The defense recalled A1C PS's boyfriend to ask about other issues raised by the mental health records. Finally, the defense thoroughly cross-examined A1C PS about the matters raised by the mental health records, including any contradictions between the mental health records and her testimony in motions practice.

The parties then presented new closing arguments and the military judge again deliberated on findings. The military judge again found the appellant guilty of all charges and specifications, and he elaborated on his findings as follows:

> [A]s an effort to provide as much transparency as I can
> without going into specific deliberations of the Court, due to
> the unique circumstances of this case I want to provide at
> least some additional information.

Each offense stood on its own. No offense played any role with respect to any other. Additionally, when I went back into my deliberations I started over with a new review of all evidence presented on the matter with the assumption that the allegation in this case could actually be false especially in light of the additional testimony that was provided by the defense. Therefore I awarded the accused a presumption of innocence unless I was re-convinced that the accused was guilty beyond a reasonable doubt of the offenses alleged.

I had the opportunity to observe both the accused and [A1C PS's] demeanor on the stand as well as consider all inconsistencies, motives to fabricate, all evidence either supporting or contradicting the two differing accounts and at the end of the day I was firmly convinced of the accused's guilt beyond a reasonable doubt. Had I not been re-convinced of the accused['s] guilt I would have found him not guilty but, I was.

The appellant alleges the military judge abused his discretion by denying the motion for a mistrial. The appellant focuses on three aspects of the ruling: (1) The military judge erroneously permitted the Government to call A1C DB as a sentencing witness before disclosing records to the defense and reconsidering his findings; (2) By denying the motion for a mistrial, the military judge countenanced "sandbagging" by the Government in withholding evidence of A1C PS's and A1C DB's mental health information from the defense until sentencing; and (3) The military judge's remedy of reconsidering his findings did not address harm to the defense in preparing its case.

We review a military judge's denial of a motion for a mistrial for a clear abuse of discretion. *United States v. Coleman*, 72 M.J. 184, 186 (C.A.A.F. 2013) (citing *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009)).

"[A] mistrial is a drastic remedy and is reserved for only those situations where the military judge must intervene to prevent a miscarriage of justice." *United States v. Garces*, 32 M.J. 345, 349 (C.M.A. 1991) (citing *United States v. Jeanbaptiste*, 5 M.J. 374 (C.M.A. 1978)). The declaration of a mistrial is a drastic resolution and military judges are encouraged to take other remedial actions to correct an error. *Ashby*, 68 M.J. at 122. A military judge has discretion to "declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). In deciding whether to grant a mistrial, the military judge should examine numerous factors, "including the timing of the incident leading to the question

of mistrial, the identity of the factfinder, the reasons for a mistrial, and potential alternative remedies; but, most importantly, the desires of and the impact on the defendant." *United States v. Harris*, 51 M.J. 191, 196 (C.A.A.F. 1996) (citing *United States v. Donley*, 33 M.J. 44, 47 (C.M.A. 1991)).

We find no abuse of discretion in the military judge's decision to deny a mistrial. We recognize that the defense specifically asked for information about any statement A1C PS made about prior sexual offenses that contradicted her in-court testimony. We agree with the military judge that in retrospect, he should have disclosed these records at the outset of the trial, as they set up at least a possible contradiction with A1C PS's testimony the defense could have used to impeach her credibility. We also agree with the appellant that once the military judge noted the mental health condition of A1C PS and A1C DB had been placed at issue, he should have provided the records at that point instead of allowing A1C DB to testify in sentencing. However, we nonetheless hold the military judge acted within his discretion in denying the motion for mistrial.

The military judge appropriately realized that a mistrial is a drastic remedy to be employed sparingly. He then chose a remedy – reopening the defense's case in findings and reconsidering his findings – that was reasonably tailored to address the harm presented by the defense not having the information in A1C PS's medical records earlier. The defense was able to fully cross-examine A1C PS, the two character for truthfulness witnesses, and A1C PS's boyfriend about this additional information. A1C PS specifically addressed the inconsistency, and the military judge was able to evaluate her testimony and demeanor just as if the information had been disclosed to the defense at the beginning of trial. There is no reason to believe the defense was in any way hampered by not having received the information in A1C PS's mental health records earlier. In fact, at the conclusion of the defense's reopened case in findings, the military judge asked trial defense counsel, "[h]ad this information been provided earlier, is this everything that you would have done in the presentation of your case?" Trial defense counsel responded, "[y]es, this is what we would have done if we had known this information."

We also reject the appellant's contention that the military judge's ruling sanctioned "sandbagging" on the part of the Government. The Government timely provided this information to the military judge for his review and there is no reason to believe the Government was aware of the inconsistency between A1C PS's testimony in motions practice and the mental health records.

While not directly related to the defense's mistrial motion, we also find that any error in allowing A1C DB to testify in findings before providing the mental health records to the defense was harmless under any standard of review. There is every reason to believe that had the defense asked to reopen its cross-examination of A1C DB, the military judge would have allowed this. There also was nothing to prohibit the defense from recalling A1C DB and cross-examining her on information in her mental health

records, as the defense's sentencing case had not been presented when the military judge provided the mental health records. The defense declined to do so.

Despite the unusual procedural matters that led to this issue, the appellant received a fair trial, and the military judge's comments following the re-announcement of findings confirm the appellant received the full benefit of the presumption of innocence upon reconsideration, just as he did in the initial findings phase. Reconsideration of findings by a military judge is a permissible option when information is raised that may cause the military judge to question the findings. We are fully satisfied that any error in failing to earlier provide the defense with the mental health record excerpts was cured when the military judge reopened the case and reconsidered the findings, again applying the proof beyond a reasonable doubt standard to determine the appellant's guilt. We see no reasonable possibility that earlier disclosure of this information would have affected the outcome of the trial. We therefore deny the appellant relief on this issue.

*Defense Motion for Severance*

Defense counsel moved the military judge before arraignment to sever the offenses involving A1C PS into a separate trial from the offenses involving A1C DB. The defense asserted the offenses involving A1C PS were significantly weaker than those involving A1C DB and cited a concern about possible spillover. The Government opposed the severance motion. The military judge denied the defense's motion, finding he could take sufficient protective measures such as requiring the Government to present its evidence separately and issuing instructions that would cure any possible confusion or spillover effect.

The military judge stated he would issue a more detailed ruling on the severance motion later. However, soon after denying the motion, the appellant elected to be tried by military judge alone. The military judge explored the impact of the appellant's forum choice on the severance issue with the appellant and his counsel. Defense counsel agreed the appellant's choice "could potentially impact the validity of [the] motion for severance and manifest injustice with respect to members." Defense counsel then clarified that the appellant's forum selection would have been different had the severance motion been granted, and he asserted the defense was not waiving the issue by electing to be tried by a military judge alone. However, defense counsel and the appellant both acknowledged that the election of a military judge alone as the forum affected the continuing viability of the severance motion. The military judge issued a more detailed ruling on this issue after entry of pleas.

R.C.M. 906(b)(10) permits a party to move for severance of offenses, "but only to prevent manifest injustice." The discussion to this rule states, "[o]rdinarily, all known charges should be tried at a single court-martial" and "[j]oinder of minor and major

offenses, or of unrelated offenses, is not alone a sufficient ground to sever offenses." R.C.M. 906(b)(10), Discussion.

We review a military judge's decision to deny a severance motion for an abuse of discretion. *United States v. Duncan*, 53 M.J. 494, 497-98 (C.A.A.F. 2000) (citations omitted). Where the military judge has denied a severance motion, the appellant must demonstrate more than the fact that separate trials would have provided a better opportunity for an acquittal. *Id.* The appellant must show that the ruling caused actual prejudice by preventing the appellant from receiving a fair trial. *Id.*

In reviewing a military judge's denial of a severance motion, we examine three factors: (1) Do the findings reveal an impermissible crossover of evidence; (2) Would the evidence of one offense be admissible proof of the other; and (3) Did the military judge provide a proper limiting instruction. *United States v. Curtis*, 44 M.J. 106, 128 (C.A.A.F. 1996) (citations omitted).

The appellant claims each of these factors reveals the military judge abused his discretion in denying the severance motion. We disagree. The military judge analyzed all three factors and concluded the appellant did not demonstrate "manifest injustice" would result from failing to sever the charges. Concerning the first factor, the allegations concerning A1C PS and A1C DB were fairly dissimilar in the manner in which the acts were allegedly committed, the extent of their previous interaction with the appellant, the way in which the two Airmen reported their allegations, and the defense's strategy at trial. Trial defense counsel recognized this in their motion for severance, acknowledging that "the two situations share nothing in common." The appellant nonetheless alleges that the allegations concerning A1C DB were stronger than the allegations concerning A1C PS, and therefore joinder of the two sets of allegations risked the factfinder finding the appellant guilty of the actions concerning A1C PS simply because of the stronger allegations concerning A1C DB. Our review of the record reveals no such concern. A1C PS's allegations were sufficiently credible to stand on their own, and when combined with the differences in their factual nature, we find no possibility the appellant was prevented from receiving a fair trial.

We note one issue as to the second factor. The military judge stated that under Mil. R. Evid. 413, evidence for each of the offenses may properly be admitted to prove the other, and that either offense may have been admitted to show the appellant's propensity to commit sexual assault. This was not so in the appellant's case, as the Government never provided notice that it intended to offer Mil. R. Evid. 413 evidence. However, the military judge stated that this factor "is not dispositive of the issue." We agree this factor is not dispositive, as the other two factors weigh strongly against severance.

Finally, concerning factor three, this was a military judge-alone case; therefore there was no need for a spillover or limiting instruction. As the defense counsel noted, the appellant's election to be tried before a military judge alone greatly reduced any potential risk of spillover. Nonetheless, the military judge extensively voiced recognition of the appropriate spillover and limiting instructions, and the military judge – in an abundance of caution – did take measures to prevent spillover, such as instructing the Government to keep the evidence concerning each alleged victim separate in its case-in-chief. The Government called all its witnesses regarding A1C PS's allegation first, and a clear transition marked the point at which the Government began presenting evidence regarding A1C DB's allegation. Trial counsel actually argued that the case presented "[t]wo very different victims, two very different assaults." Immediately before closing argument, the military judge reiterated that "I am very aware as I've mentioned numerous times of the spillover [sic]. Each offense will be treated separately." The military judge also noted the Government had properly bifurcated its case and no propensity evidence was introduced under Mil. R. Evid. 413; therefore, it was "very easy for the court to determine which facts relate to each of the offenses alleged and to each of the alleged victims in this case."

Even had the appellant elected to be tried before members, we are confident joinder of the two sets of allegations presented no risk of manifest injustice. The appellant's position – if taken to its logical conclusion – is that nearly every sexual assault case involving more than one victim should be severed. No such requirement exists, and nothing about this case poses any risk of manifest injustice. The military judge did not abuse his discretion in denying the motion to sever.

*Unreasonable Multiplication of Charges*

The appellant was convicted of two specifications concerning his sodomy with A1C PS. First, he was convicted of a specification under Article 120, UCMJ, for abusive sexual contact, which alleged that he caused A1C PS to engage in sexual contact – placing his penis in her mouth – by placing her in fear of physical injury. Second, he was convicted of a specification under Article 125, UCMJ, which alleged that he committed sodomy with A1C PS by force and without her consent.

During the investigation under Article 32, UCMJ, defense counsel asserted the two charges were multiplicious or represented an unreasonable multiplication of charges. The Government responded, "they are being charged in the alternative. If this case goes forward to trial, it is our intent to submit an instruction to the jury to explain this."

The defense moved at trial to dismiss the abusive sexual contact specification involving A1C PS, asserting this specification was either multiplicious with the forcible sodomy charge and specification or it represented an unreasonable multiplication of charges. Defense counsel noted the Government had earlier represented its intention to

charge this matter in the alternative. In the unreasonable multiplication of charges discussion, the defense particularly focused on the fact that the Government initially represented that the charges were being offered in the alternative as proof of prosecutorial overreaching. The Government opposed the motion, asserting that the two charges were neither multiplicious nor represented an unreasonable multiplication of charges because they "cover two different aspects of criminal behavior." The Government reasoned that the two charges represented two distinct acts by the appellant: the forcible sodomy charge covered the appellant's alleged act of grabbing A1C PS's neck and holding her down while he inserted his penis into her mouth, while the abusive sexual contact charge covered what took place immediately thereafter when he allegedly struck A1C PS on the back of her head, placing her in fear that caused her to continue the sexual act.

The military judge heard argument on the motion. He asked trial counsel about the Government's representation at the Article 32, UCMJ, investigation that the two charges were being offered in the alternative. Trial counsel stated he was assigned to the case after the Article 32, UCMJ, hearing, whereupon he examined the charges and believed they were more properly read as covering two distinct acts by the appellant rather than alternative charging. After hearing argument on the motion, the military judge ruled the two charges were neither multiplicious nor represented an unreasonable multiplication of charges. The military judge first found the two charges were not multiplicious because the elements of the two offenses were distinct in that forcible sodomy required an additional element that abusive sexual contact did not, namely that A1C PS did not consent to the act. The appellant does not challenge this ruling on appeal. The military judge then deferred ruling on the unreasonable multiplication of charges issue until the parties presented evidence. At the conclusion of evidence in findings, the military judge found appellant was not subject to an unreasonable multiplication of charges, though he did merge the two offenses for sentencing purposes. The appellant now challenges the unreasonable multiplication of charges aspect of the military judge's ruling.

A military judge's decision to deny relief for unreasonable multiplication of charges is reviewed for an abuse of discretion. *United States v. Pauling*, 60 M.J. 91, 95 (C.A.A.F. 2004) (citations omitted).

In *United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001), our superior court explained that unreasonable multiplication of charges is a distinct concept from the constitutional prohibition against multiplicity. The Court noted the concept of unreasonable multiplication of charges "has long provided courts-martial and reviewing authorities with a traditional legal standard – reasonableness – to address the consequences of an abuse of prosecutorial discretion in the context of the unique aspects of the military justice system." *Id.* at 338. The Court then approved of a five-pronged approach for evaluating claims of unreasonable multiplication of charges:

(1) Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?

(2) Is each charge and specification aimed at distinctly separate criminal acts?

(3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?

(4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?

(5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*Id.* at 338 (citations omitted). These factors are not "all-inclusive," nor is any one of them a prerequisite to finding unreasonable multiplication of charges. *United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012). In addition, the concept of unreasonable multiplication of charges "may apply differently to findings than to sentencing," and in a case where the charging scheme does not implicate the *Quiroz* factors in the same way that the sentencing exposure does, "'the nature of the harm requires a remedy that focuses more appropriately on punishment than on findings.'" *Id.* (quoting *Quiroz*, 55 M.J. at 339).

The military judge thoroughly discussed all five *Quiroz* factors in determining the appellant was not subject to an unreasonable multiplication of charges. The military judge first found the appellant had "explicitly or clearly" objected to unreasonable multiplication of charges. Second, he held the charges to be "distinct criminal acts" with "distinct elements." Next, the military judge found that the appellant's criminality was not misrepresented or exaggerated by the number of charges and specifications brought against him. Addressing the fourth factor, he reasoned that because offenses are combined to find the maximum punishment for a court-martial, the charges at issue caused no risk of increased punitive exposure for the appellant. Finally, the military judge found that trial counsel made clear in their motion response their reason for drafting separate charges and additionally, the offenses require proof of different elements, eliminating any evidence of prosecutorial overreaching or abuse. The military judge then elected to merge the specification alleging abusive sexual contact toward A1C PS and the forcible sodomy charge and specification for sentencing.

We find no abuse of discretion in the military judge's thorough, reasoned ruling. Trial counsel may have initially represented that the two charges were offered in the alternative, but we see no reason why the Government must be permanently bound by such a representation, and the appellant cites no binding or persuasive authority for his

proposition that the Government must be bound by its initial charging strategy. The explanation provided at trial for the two charges fits the facts of this case, when the appellant's act of hitting A1C PS on her head transformed the act from forcible sodomy to abusive sexual contact. The Government's case emphasized that this act marked a decisive point in the encounter that placed A1C PS in fear, and the method of charging this case fits the evidence presented. The appellant was subjected to no additional punitive exposure as a result of the charging method, and in any event, the military judge merged the two matters for sentencing. We find no error pertaining to this issue.

*Questioning Witnesses about Other Witnesses' Truthfulness*

The appellant next alleges the military judge committed plain error when he failed to sua sponte stop trial counsel from questioning witnesses about other witnesses' truthfulness at two points in the court-martial. The first came when the appellant took the stand and testified in his defense. On cross-examination, trial counsel repeatedly pointed out the contradictions between the appellant's testimony and that of the two alleged victims, and asked the appellant if the two alleged victims were lying when they testified in a manner inconsistent with the appellant's account. In total, trial counsel asked the appellant about 15 times if the alleged victims were lying in their testimony, and each time the appellant replied that they were.

The second occurrence the appellant cites as error took place when A1C PS's boyfriend testified in findings. Anticipating that defense counsel would portray him as coercing A1C PS into filing the report, trial counsel asked several questions about the circumstances under which A1C PS decided to report the alleged sexual assault. This led to the following exchange:

> Q: When she confided in you and told you of the incident that had happened, what was your reaction?
>
> A: I was pretty upset about what had happened, especially since it's someone that she works with. I couldn't believe that he would do that to her.
>
> Q: Were you upset at [A1C PS] at all?
>
> A: No, ma'am.
>
> Q: Did you ever accuse her of not telling the truth?
>
> A: No, ma'am.
>
> Q: Did you ever feel that she was not being honest?

A: No, ma'am. I knew she wasn't comfortable talking about it. That's why I recommended that she go talk to a therapist or somebody else if she wasn't comfortable talking to me about it.

A military judge's decision to permit questioning and comment, in the absence of defense objection, is reviewed for plain error. *United States v. Lewis*, 69 M.J. 379, 383 (C.A.A.F. 2011) (citing *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008)). Under the plain error standard an appellant must demonstrate: "1) an error was committed; 2) the error was plain, clear, or obvious; and 3) the error resulted in material prejudice to substantial rights." *Maynard*, 66 M.J. at 244 (quoting *Untied States v. Hardison*, 64 M.J. 279, 291 (C.A.A.F. 2007)).

A witness is generally not permitted to opine that another witness is lying or telling the truth. *United States v. Birdsall*, 47 M.J. 404, 410 (C.A.A.F. 1998); *United States v. Marrie*, 43 M.J. 35, 41 (C.A.A.F. 1995). Our superior court has also held it may be improper for trial counsel to ask an accused to opine whether government witnesses against him are lying. *United States v. Jenkins*, 54 M.J. 12, 17-18 (C.A.A.F. 2000). However, the Court also made clear this principle is to be applied on a "case-by-case basis" to determine if such questions are prejudicial. *Id.* at 17. Therefore, in *Jenkins*, the Court held that repeated questions of the accused with regards to whether Government witnesses were lying were not prejudicial because his defense counsel had already implied the Government witnesses were lying in his opening statement. The Court concluded, "For trial counsel to force appellant to acknowledge under oath what his counsel had already asserted was harmless error." *Id.* (citing *United States v. Cole*, 41 F.3d 303, 309 (7th Cir. 1994)).

We find no plain error in trial counsel's questioning of the appellant. Trial counsel's repeated inquiries into whether Government witnesses were lying may be impermissible in some contexts, but here trial counsel asked no more than what trial defense counsel had already asserted. Defense counsel's opening statement repeatedly referred to a "gap" between what Government witnesses would testify to and what the evidence would reveal. Defense counsel also asserted that "the things [A1C PS] will tell you don't match other action." In cross-examination, defense counsel essentially implied A1C PS was lying in a series of questions when he asked her if she was really just embarrassed to talk about a consensual sexual encounter with her boyfriend. Although it came after the appellant's testimony, trial defense counsel's closing argument included a suggestion that A1C DB lied in reporting a sexual assault because she was upset that the appellant ejaculated inside her and then he left the room. In short, no small part of the defense's case was built on the implication – if not the outright assertion – that A1C DB and A1C PS were lying. There is therefore no prejudicial error in trial counsel asking the appellant if these witnesses were lying. Even assuming the military judge erred by

failing to stop such questioning and such error was plain and obvious, no material prejudice to the appellant resulted. Trial defense counsel did not object to the questioning, and a lack of objection is "some measure of the minimal impact" of the questions and answers. *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999) (citations and internal quotation marks omitted).

We see no error – plain or otherwise – in trial counsel's questions toward A1C PS's boyfriend. Trial counsel was not attempting to elicit his opinion as to whether A1C PS was truthful in her sexual assault report. The one question, "Did you ever feel that she was not being honest," was part of a series of questions designed to demonstrate whether A1C PS's boyfriend attempted to coerce her into filing a sexual assault report. It was not designed to intrude upon the factfinder's dominion of observing and assessing A1C PS's credibility, and trial counsel did not ask if her boyfriend believed she was telling the truth at trial. Rather, trial counsel merely asked if A1C PS's boyfriend was upset with her, accused her of not telling the truth, or believed she was untruthful when she first confided in him in order to show A1C PS filed the report voluntarily. The answer provided by A1C PS's boyfriend further demonstrates the question was not understood as a form of human lie detector but as an inquiry into the dynamics of how A1C PS reported the incident. The military judge did not err in failing to sua sponte exclude A1C PS's boyfriend's answer to this lone question.

*Failure to Include Appellate Exhibit II*

The original record of trial submitted contains as Appellate Exhibit I the defense's motion for severance. The index lists Appellate Exhibit II as the Government's response to the severance motion; however, the document at Appellate Exhibit II is actually another copy of the defense's severance motion. The Government's response to the severance motion did not originally appear in the record of trial. Therefore, the appellant asserts that the record of trial is not complete within the meaning of Article 54, UCMJ, limiting the maximum sentence that may be imposed upon the appellant.

In preparing its answer to the appellant's assignment of errors, the Government moved to attach a purported copy of the missing appellate exhibit. Contemporaneously, the Government also moved to submit an affidavit from trial counsel in this case. Trial counsel's affidavit avers that the document the Government moved to attach was identical to the one provided to the military judge, and that the Government's response was properly submitted to the military judge in motions practice. This Court granted the Government's motion to attach its response to the severance motion and the trial counsel's affidavit.

Whether a record of trial is complete is an issue we review de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000).

Article 54(c)(1), UCMJ, requires a "complete" record of the proceedings and testimony to be prepared for any general court-martial resulting in a punitive discharge. A "complete" record must include the exhibits that were received in evidence, along with any appellate exhibits. R.C.M. 1103(b)(2)(D)(v).

Failure to comply with this rule "does not necessarily require reversal." *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citations and internal quotation marks omitted). Where a record is missing an exhibit, this Court evaluates whether the omission is substantial. *Henry*, 53 M.J. at 111. "Insubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *Id.* If the omission is substantial, thereby raising a presumption of prejudice, the Government may rebut the presumption by reconstructing the missing material. *See United States v. Garries*, 19 M.J. 845, 852 (A.F.C.M.R. 1985) (finding that where court recording equipment malfunction for approximately five minutes and the military judge promptly directed reconstruction of the unrecorded testimony, the record was rendered substantially verbatim and even assuming a presumption of prejudice arose, the Government rebutted the presumption through the reconstructed testimony); *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982) (holding that military judge's reconstruction of unrecorded portions of a witness's testimony rendered the record "substantially verbatim"); *but see United States v. Snethen*, 62 M.J. 579, 581 (A.F. Ct. Crim. App. 2005) (holding that where at least an hour of witness testimony and argument in motions practice went unrecorded, a military judge's reconstruction of the missing witness testimony in question and answer format was insufficient to overcome the presumption of prejudice, because of the importance of the lost testimony and arguments, the lengthy duration of the unrecorded portion of the proceedings, and the length of time between trial and reconstruction efforts).

Even assuming the missing appellate exhibit constituted a substantial omission, we find the Government rebutted any presumption of prejudice. Trial counsel's affidavit satisfactorily demonstrates the document now attached to the record is identical to the one submitted at trial. Now having the benefit of the appellate exhibit the military judge reviewed, this Court is able to conduct a full review of the record under Article 66, UCMJ, 10 U.S.C. § 866. There is no conceivable prejudice the appellant can cite in light of the Government's reconstruction of the missing exhibit, and the appellant is therefore not entitled to relief on this issue.

*Cumulative Effect of Errors*

The appellant also contends that even if none of his multiple assignments of error entitle him to relief, he is nevertheless entitled to relief under the cumulative error doctrine. We review such claims de novo. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). Under the cumulative error doctrine, "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a

finding." As we have found no merit in any of the appellant's assigned errors, the cumulative error doctrine provides the appellant with no basis for relief. *See United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999) ("Assertions of error without merit are not sufficient to invoke this doctrine.")

*Factual Sufficiency*

The appellant alleges the evidence is factually insufficient to support a finding of guilty on any of the charges or specifications. We have considered the extensive arguments in the briefs from the appellant and the Government; however, for brevity's sake, we summarize only the most pertinent arguments here. The appellant asserts that his testimony provides a rational hypothesis of innocence while PS and A1C DB – on whose testimony all the charges and specifications rest – did not prove themselves credible witnesses.

The appellant alleges that A1C PS's credibility is undercut by the following facts: the length of time A1C PS continued to keep her mouth on the appellant's penis after he struck her; she kept her mouth on his penis even as he sat down in the recliner; she did not report the incident until several months later; she continued to work in the same shop and accepted occasional car rides from the appellant (including a ride to the SARC when she eventually reported the incident); and her relationship with her boyfriend, which the appellant contends provided A1C PS a motive to fabricate her allegations.

Concerning A1C DB, the appellant alleges that A1C DB's previous consent to intercourse and her actions in waking him and inviting him back to her room demonstrate her consent to intercourse on the morning in question. He surmises A1C DB was upset by the fact that he ejaculated inside her (something he normally did not do during intercourse) and then left. He also asserts that testimony from A1C DB's next-door neighbor that she heard noises like furniture moving cannot be relied upon to support the conviction because the neighbor maintained that the noises took place hours before the charged event. Finally, he asserts A1C DB falsely told the nurse who conducted her sexual assault examination that she was drunk, undercutting her credibility.

We review issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987), *quoted in United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (internal quotation marks omitted). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

We have reviewed the record of trial and evaluated all the arguments by the appellant and the Government. Making our own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt, and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt on all charges and specifications beyond a reasonable doubt. Concerning A1C PS, we have no difficulty believing A1C PS's account of the events in question. It is no great stretch to believe that A1C PS – a young, inexperienced woman newly assigned to her first permanent duty station – would be frightened into performing oral sex upon the appellant after he immediately grabbed her crotch, stuck his penis in her mouth while holding the back of her neck, and then struck her on the head.[2] We see no inconsistency between her account and her failure to report the incident earlier, and her testimony indicates she kept working with the appellant and accepting occasional rides from him because she did not want to alert others what happened, a reasonable response.

Concerning A1C DB, she promptly reported the incident and maintained a consistent account throughout the investigation and court-martial process, admitting her own sexual behavior and her continuing relationship with the appellant while firmly maintaining the appellant sexually assaulted her on the morning in question. Even assuming the neighbor's testimony does not corroborate A1C DB's testimony, no such corroboration is necessary. The "lie" to the sexual assault nurse examiner does not undercut A1C DB's credibility, as there was no doubt A1C DB consumed alcohol that night and the nurse may well have been confused by A1C DB's description of how she faked being drunk to dissuade the appellant from his sexual advances. A1C DB's allegations appear credible and consistent, and form a solid basis for the appellant's conviction.

In short, we ourselves are personally convinced of the appellant's guilt, despite his arguments to the contrary. The appellant's conviction on all charges and specifications is factually sufficient.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000).

---

[2] The appellant characterizes the hit as a "bop" or a "tap," but those words were used by trial defense counsel in cross-examination. A1C PS did not testify in great detail as to the force involved, but said the hit was "[h]ard enough to scare me."

Accordingly, the approved findings and sentence are

AFFIRMED.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court

ACM 38305